**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                              **Case No.  8:04-cr-541-T-17TBM**

**SHANNON DELONDE WILLIAMS,**

        **Defendant.**

                                      /


**REPORT AND RECOMMENDATION**

THIS CAUSE is before the court on referral by the Honorable Elizabeth A.

Kovachevich for a Report and Recommendation[1] on the Defendant's **Motion to Suppress**

(Doc. 23) and the Government's response in opposition (Doc. 28).  By his motion, Defendant

seeks to suppress firearms and ammunition, as well as a post-arrest statement, which he

alleges were the product of an illegal detention, search, and seizure by officers of the Tampa

Police Department on August 8, 2004.  An evidentiary hearing was conducted on April 20,

2006.[2]

---

[1]See (Doc. 24); M.D. Fla. R. 6.01(b), (c).

[2]Mistakenly, I required defense counsel to proceed with the evidence.  Post-hearing, I advised counsel that she could revisit the matter further at a subsequent evidentiary hearing if she wished, but counsel has declined the offer.  Thus, any error in this regard is waived.  In any event, a review of the testimony reveals that the Defendant was well represented and the record sufficiently developed.

Evidence adduced at the evidentiary hearing indicates that Corporal Mark Yost of the Tampa Police Department (hereinafter "TPD") was on routine patrol at 3:28 a.m. on August 8, 2004, when he observed a 2004 model Lincoln Town Car backed into a parking space at the Alamo Motel on Nebraska Avenue.  Yost was suspicious because based on his experience, vehicles parked like that at this type of budget motels were often stolen or the owners of the car had outstanding warrants.  Yost pulled into the motel's parking lot to investigate further.  He positioned his cruiser in front of the Lincoln so that it could not be driven off and from that point forward neither the vehicle nor any occupant was free to leave.  Yost exited his vehicle and walked to the rear of the Lincoln to check the license tag.  As he walked by the vehicle, Yost observed the Defendant reclined in the driver seat asleep.  Yost radioed the tag number to his dispatch and, shortly thereafter, dispatch advised that there was "no record found" for the tag.  To Yost, this meant that the tag was no longer registered to a vehicle.  He found this "very suspicious" given that the tag was on a new car.  Yost then went to the driver's side window and knocked on the window to wake the Defendant so that he could determine why he was at the motel and to check the Lincoln's vehicle identification number (hereinafter "VIN").  According to Yost, this motel has a trespass affidavit on file with the TPD, which authorizes Tampa police officers to stop and detain people to find out why they are on the property.

The Defendant refused to unlock the door or roll down his window, and he repeatedly told Yost that he had not done anything wrong and did not have to open his door.  Yost observed Defendant reaching for the ignition and elsewhere in an apparent effort to find his keys.  By his account, this went on for ten to fifteen minutes, during which time he was

2

asking Defendant to get out of the car and produce identification so that he could check out why this tag was on the car.  The Defendant did not say why he was at the motel, but he said he was visiting someone there.  This was checked out by other officers.

By Yost's testimony, the motel owner came outside after five or ten minutes while Defendant was still in the vehicle.  When asked whether he knew the driver and why he was there, the owner indicated that he did not know the driver and that he did not have a room at the hotel.  According to Yost, the owner further indicated that he wanted the individual and the car off the property.

On cross-examination, Yost indicated that he has worked for seventeen years with the TPD, and fourteen or fifteen of those years were in this area of town.  By his account, the area is known for drug activity and prostitution with dealers and prostitutes staying at these small motels.  He has found stolen vehicles parked at these motels.  In the usual course, he would run a registration, but here Yost testified he needed to obtain the VIN located in front of where Defendant was seated due to the Defendant's lack of cooperation.  Officers McCasland and Berry arrived very quickly to the scene.  They knocked on the motel room doors.  McCasland ran the name given by the Defendant and told Yost that he had no valid driver's license.  At this point, the officer knew the Defendant was not going to drive the vehicle off the motel premises.

According to Yost, after speaking to the hotel owner, he again advised the Defendant to get out of the car.[3]  After speaking with the motel owner, he advised Defendant that if he

---

[3]Yost claims he asked Defendant to get out of the car fifty or more times during the entire incident.

3

did not get out of the car and leave, he would be arrested.  The Defendant continued to refuse, and eventually Yost sprayed his "OC" gas[4] into the interior of the car through a crack in the window.  The Defendant moved to the passenger seat and covered his face with a towel.  Only after Officer Berry also sprayed OC into the car did the Defendant exit the passenger door. According to Yost, the Defendant attempted to push Berry out of the way and exit toward the rear of his vehicle.  The Defendant was taken down and arrested for trespassing.

Yost testified that a tow truck was called, and he conducted an inventory search of the contents of the Lincoln, which he listed on an inventory sheet.  He found a loaded .357 pistol in the center armrest and a .223 rifle under a boom box in the trunk of the vehicle. Yost's report reflects that Defendant was taken into custody at 3:48 a.m., twenty minutes after he first checked onto the scene.

Officer Thomas McCasland, also of the TPD, testified that on August 8, 2004, at about 3:30 a.m., he was on routine patrol when Yost radioed for back-up, referencing "suspicious vehicle" at the Alamo Motel.  McCasland arrived and observed Yost's cruiser parked in front of a Lincoln automobile that was backed into a parking space up against the side of the motel.  The witness heard dispatch indicate "no record found" for the tag on the Lincoln.  By his account, this would mean either an erroneous number had been given or inputted or that the tag was not registered.  He observed Yost knock on the window to wake up Defendant so he could get some paperwork on the car.  Once awake, Defendant looked at the officers with a "dumb look" on his face and then immediately began reaching for the

---

[4]"OC" stands for "Oleoresin Capsicum" and is commonly known as pepper spray.

4

ignition to start the vehicle.  The Defendant said everything was all right and asked what was

going on.  According to McCasland, Defendant was asked to step out of the vehicle because

he could not roll down the windows since the key was in the ignition.  The Defendant never

agreed to get out of the car.  The Defendant was not free to leave, although the officer had no

reason to believe that he was trespassing or that the car had been stolen.  By this officer's

account, being in the parking lot at that time of the morning was "suspicious."

    McCasland testified that Defendant indicated he was staying with his Uncle Charles

in Room 3.  McCasland checked Room 3 but got no response.  McCasland then checked with

the owner of the motel, who indicated there was a Charles in Room 2.  The owner indicated

he did not know Defendant.  At some point after they went to check Room 2, Yost indicated

that the owner wanted Defendant "trespassed."

    On cross-examination and by questioning from the court, McCasland affirmed that it

is unusual to have a "no record found" tag on a new car.  The usual next step would be to

check the registration on the vehicle.  When they learned of the "no record found," Defendant

was asleep and so Yost knocked on the window to wake him.  During the time Yost was

attempting to get Defendant out of the car, McCasland and Berry checked out the information

the Defendant provided.  Thus, he checked Room 3 for his "Uncle Charles" and got no

answer.  He next went to the office and asked the owner if he knew of Defendant.  When he

said no, the witness asked Defendant his name, and Defendant gave the name, "Jason L.

Glanton."  The officer ran that name through a Florida motor vehicle database and received a

response that his license was suspended.  McCasland asked the motel owner whether he knew

a "Charles," and the owner indicated that a "Charles" stayed in Room 2.  McCasland and

5

Berry knocked on Room 2 and received no answer.  Yost then indicated that the owner wanted the Defendant trespassed from the property.  Yost told the Defendant that he was trespassing and he would have to get out of the vehicle and leave, since his license was suspended.  The Defendant again would not open the door.  Yost warned him if he did not get out of the vehicle, the officers would use OC.  After the Defendant was forced out of the vehicle and arrested, Yost searched the trunk of the vehicle and found a rifle and ammunition in a case.

While transporting the Defendant to the station, the Defendant asked McCasland if a stereo and fishing poles were still in the trunk.  According to McCasland, no Miranda warnings were given, and no questions were asked.[5]

Officer Daniel J. Berry, also of the TPD, responded to assist Yost.  Berry's testimony is essentially consistent with that of Yost and McCasland.  He did recall the Defendant looking around for his keys so he could leave.  By his recollection, he and McCasland knocked on a couple of doors.  They received an answer at one of the doors, but the occupant did not know Defendant.  When Defendant finally exited his vehicle, he attempted to push Barry out of the way but was then taken down and arrested for trespassing.[6]

Finally, the court heard testimony from K. Patel, the manager of the seven-room Alamo Motel.  On August 8, 2004, he heard noises outside and went into the office to check it out.  Patel observed a police officer knocking on the door of a car.  Another officer asked him

---

[5]Yost and McCasland testified -- rather inconsistently -- about a "be on the look-out" or "BOLO."  However, it is apparent that it had no real connection to this stop and detention, and the testimony is not recounted here.

[6]*After* Defendant was arrested, this officer checked the name, "Jason L. Glanton," and found that it was his alias.

6

if a person named "Charles" lived there, and he indicated that a "Charles" was staying in
Room 2.  Patel and an officer went to Room 2 but received no response.  He then went back to
the office, and sometime thereafter, an officer came in and asked him if knew the individual in
the car and whether he wanted to leave the car there or issue a trespass warning.  Patel
responded that he did not know the individual and that he wanted the car and the individual
off the property.

He also identified the Government's Exhibits 1 through 3, which included
photographs of the motel and a trespass warning posted on the window of the office.  The
warning gives notice that Tampa Police have been given the authority to remove trespassers
from the premises.  <u>See</u> Gov't. Ex. 3.  Patel believed that this occurrence went on for well
over a half-hour, although he was not sure exactly how long.


II.

It is well-settled that the Fourth Amendment prohibits "unreasonable searches and
seizures" by the government, and its protections extend to brief investigatory stops of persons
or vehicles that do not amount to a full, traditional arrest.  <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968);
<u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  The Fourth Amendment is satisfied if the
officer's actions are supported by reasonable suspicion to believe that criminal activity "may
be afoot."  <u>Terry</u>, 392 U.S. at 30.  "Reasonable suspicion" is a less demanding standard than
probable cause and requires a showing considerably less than preponderance of the evidence.
<u>Illinois v. Wardlow</u>, 528 U.S. 119, 123-24 (2000).  However, the Fourth Amendment requires
at least a minimal level of objective justification for making the stop; the officer must be able

to articulate more than an "inchoate and unparticularized suspicion or hunch" of criminal activity.  Id. (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry, 392 U.S. at 27)); Cortez, 449 U.S. at 417.

In making a reasonable-suspicion determination, the court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  United States v. Arvizu, 534 U.S. 266, 273-74 (2002) (citing Cortez, 449 U.S. at 417-18).  This process allows officers to draw on their own experience and specialized training to make inferences from, and deductions about, the cumulative information available to them that "might well elude an untrained person." Arvizu, 534 U.S. at 273-74 (quoting Cortez, 449 at 418, and citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).

In Terry, the Court adopted "a duel inquiry for evaluating the reasonableness of an investigative stop."  United States v. Sharpe, 470 U.S. 675 (1985); see also United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004).  By this approach, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Sharpe, 470 U.S. at 682.  Whether an officer's actions were justified at the inception "turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime."  Acosta, 363 F.3d at 1144-45.  In the second part, the court looks to whether the stop was reasonably related in scope to the circumstances which justified the stop in the first place. Id.

8

A search that is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope, see Terry, 392 U.S. at 18-19 (citing Kremen v. United States, 353 U.S. 346 (1957); 19 Go-Bart Importing Co. v. United States, 282 U.S. 344, 356-358 (1931)), and by reason of its duration. Sharpe, 470 U.S. at 686. For a Terry stop to be valid, "it must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate for the court to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. Sharpe, 470 U.S. at 686. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Id. The court should also consider the law enforcement purposes served by the detention, the scope and intrusiveness of the detention, and the duration of the detention. Acosta, 363 F.3d at 1146 (quoting United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000)).

An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity. Wardlow, 528 U.S. at 124 (citing Brown v. Texas, 443 U.S. 47 (1979)). However, officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation, and whether a stop

occurred in a "high crime area" is among the relevant contextual considerations in a <u>Terry</u>

analysis.  <u>Wardlow</u>, 528 at 124 (citing <u>Adams v. Williams</u>, 407 U.S. 143, 144, 147-148

(1972)).  While the Supreme Court has not held that an officer may order a driver out of a

vehicle whenever the officer has an occasion to speak with the driver, the Court has

determined that the Fourth Amendment allows an officer to order the driver to get out of the

vehicle once the vehicle has been lawfully stopped for a traffic violation.  <u>Pennsylvania v.

Mimms</u>, 434 U.S. 106, 111 (1977).


III.

By Defendant's argument, Yost was without an articulable, reasonable suspicion of

criminal activity to justify his initial stop of the Defendant by blocking his car in such a

manner that he could not leave.  By his argument, regardless of this officer's experience in

this area of town, there is nothing illegal or even suspicious about a car being backed into a

parking space at a motel.  Even if the circumstances gave rise to a reasonable suspicion that

the car was stolen, once the report on the tag came back "no record found," the Defendant

should have been free to leave, and the officer had no right to further detain the Defendant to

explore why he was on the premises.  Defendant argues that the officer improperly extended

the scope of the stop to explore why he was on the premises, and the unwarranted extension

also violated his Fourth Amendment rights.  Because the firearms and statement were the

product of this illegal conduct, the evidence should be suppressed.

In response, the government urges that the circumstances of the location of this

vehicle in this neighborhood, coupled with Yost's experience in working this neighborhood,

10

provided adequate suspicion to permit him to investigate.  It argues the report of "no record

found" was a highly suspicious circumstance that warranted further inquiry by the officer, as

was the fact that Defendant indicated he was staying with his uncle in Room 3 and no one

responded to the officer's knock on the door to that room.  The government urges further that,

when a check of the name given to the officers by Defendant revealed an invalid driver's

license, the officers were in no position to allow Defendant to drive off.  Given that the motel

owner did not know Defendant and indicated that he wished for the vehicle and Defendant to

be removed, the officers were fully justified in ordering Defendant to leave the premises.

Finally, when Defendant refused to so, Defendant was properly arrested for trespass after

warning, and the subsequent inventory search of the vehicle pursuant to a valid arrest was

therefore proper.  Accordingly, the government urges that suppression is not warranted.


IV.

I find as follows.  At the outset, Yost was without an articulable reasonable suspicion

of criminal activity afoot to warrant any seizure of the Defendant or this vehicle.  There is no

constitutional prohibition preventing an officer from approaching a vehicle parked outside a

motel to examine its tag or even to speak to its occupant.  However, when the inquiry is

conducted in such a manner that a seizure occurs, the Fourth Amendment is implicated, and

the officer must demonstrate an adequate and lawful basis for his conduct or face the

consequence of losing evidence obtained as the fruit of the illegal seizure.  Neither Yost's

knowledge of the type criminal activity prevalent in this area nor his experience indicating

that persons backing their vehicles into motel parking spaces sometimes did so because the

11

car was stolen or the occupant had outstanding warrants justified his immediate seizure of the Defendant.[7]

In the particular circumstances of this case, however, I see the starting point for the analysis to be the moment when Yost first woke the Defendant by knocking on the window of the Lincoln rather than at the time when the officer first blocked in the vehicle. Only after the Defendant was awakened and realized his circumstances could he have believed or understood that he was not free to leave. It is at that point when his Fourth Amendment rights were first implicated. Also at that point, the officer was armed not only with his experience and what he had observed but with the additional fact that the tag on the Lincoln was not registered to the car. Under Florida law, it is a crime for a person to intentionally attach on a vehicle a license plate not issued, assigned, or transferred to that vehicle. See Fla. Stat. ch. 320.361. While Yost may not have previously had a reasonable suspicion of criminal activity afoot, the added fact of an unregistered tag on a new model vehicle was sufficient justification for his waking the driver to investigate these circumstances further. In the peculiar circumstances of this case, I find this initial detention of the Defendant was justifiable at its inception. What followed is somewhat more problematic.

The Defendant urges that even if the stop was initially permissible, the investigation by the officers was unrelated to the reason justifying the stop and was too long in duration. The facts reveal that after waking the Defendant, Yost asked him to get out of the car. Ostensibly, this was to allow him to look in the area in front of the Defendant for the VIN

---

[7]The fact that the motel owner had filed a "trespass letter" with the police department did not permit the officer to detain persons in contravention of their constitutional rights.

number, which he could then run to obtain the registration information, but clearly Yost also had intentions of determining why the Defendant was on the premises.[8]  The record does not make clear whether the VIN was visible to the officer from outside the vehicle, but it is evident that the manner chosen by the officer to learn the VIN was likely not the least intrusive means available to him for this purpose.  Indeed, the simplest way to obtain this information about the registration would have been to ask the Defendant to produce it.  Here, there is no testimony that this simple inquiry was made by any of the officers on the scene.[9]  On the other hand, there is no indication in the record that the Defendant would have or could have cooperated in producing this information had he been asked to do so.

Instead, an immediate standoff resulted with Yost persisting in his request that the Defendant get out of the vehicle to resolve the matter and the Defendant declining to do so.  It would appear that this song and dance lasted for a good fifteen minutes.  During that period of time, the issue of the registration remained unresolved, and the officers' focus turned to determining whether the Defendant had any business in being on the premises.

Thus, in response to the officers' inquiry, the Defendant advised he was staying with his Uncle Charles in Room 3.  When the officers could not verify this, they next inquired of

_____

[8]As Defendant's counsel points out, the officer's testimony concerning the need to read the VIN is contradicted by his offense report, which indicated that his reason in asking the Defendant out of the vehicle was so he could determine his purpose for being at the motel.

[9]Whether the officer had the lawful authority at the outset to request the Defendant to exit the car is debatable.  As noted above, this issue was left unresolved by the Court in Pennsylvania v. Mimms, see supra at 10.  However, it need not be decided on this motion, as nothing came of this request and the Defendant elected to remain in his car protesting that he had done nothing wrong.  As discussed below, once the motel owner asked the officer to have the Defendant and the car removed from the premises, the authority of the officer to direct the Defendant out of the car was clear, given the fact that Defendant had no valid driver's license.

13

the motel manager and learned that a person named Charles was staying in Room 2; however, he could not be located in that room, either.  When the manager also indicated that he did not know the Defendant, the officers sought the Defendant's name.  A check of a Florida drivers database for the name given indicated that the person's license was suspended.  This fact significantly compounded the Defendant's problems, as Yost then determined that the Defendant would not be driving the vehicle off the premises in any event.  Yost sought and received consent of the motel manager to issue the Defendant a trespass warning.  After nearly twenty minutes since he had first checked out on the call, Yost advised the Defendant that he would have to exit the car and leave the premises.  When the Defendant still refused to exit the car, OC gas was used to force him out, and he was arrested for trespass after warning.  As a consequence of his arrest, the police conducted an inventory search and located firearms.

After careful consideration, upon these findings, I conclude that the officers' conduct was reasonably related to Yost's reason for confronting the Defendant about the unregistered license plate.  Because this was a possible criminal violation, the situation merited the officer's further attention.  The fact that the officer might have initially pursued his inquiry in a less intrusive manner by simply asking for the registration is not necessarily controlling.  As the Court noted in Sharpe, the fact that less intrusive means could have been used by the police does not, in itself, render the search or seizure unreasonable.  Id. at 686 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").

As noted above, the record does not reveal that the Defendant could have or would have cooperated any differently than he did had he been asked for his registration.  Further,

14

the fact that the officers' inquiry extended to the identity of the Defendant, and his reason for being on the premises did not constitute an unreasonable expansion of the investigative stop in the given circumstances.  As the Court has recognized, questions concerning a suspect's identity or matters related to the purpose of the stop are a routine and accepted part of many Terry stops.  See Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County, 542 U.S. 177, 186-87 (2004); see also United States v. Hensley, 469 U.S. 221, 229 (1985); Hayes v. Florida, 470 U.S. 811, 816 (1985); Adams v. Williams, 407 U.S. 143, 146 (1972).  Here, in the early morning hours in an area known for drugs and prostitution, the Defendant was found asleep behind the wheel of a new model vehicle with a license plate that did not belong on the vehicle.  In these circumstances, it was entirely reasonable for the officers to also want to know who the person was and what he was doing there.  Even assuming the Defendant had no duty to answer these questions, the inquiry itself was not unreasonable.

The Defendant's continued detention while the officers checked out his claim that he was staying with his Uncle Charles and while they sought verification from the motel manager as to whether he was appropriately on the premises was not unreasonable or unduly prolonged.  The officers' suspicions about the license plate were unresolved, and they were dealing with an individual who would not exit the car and who could not be permitted to drive off without violating the law.  The use of the trespass warning by Yost as a means to resolve the stalemate is not demonstrated to be either unreasonable or unlawful.  In the end, the Defendant's refusal to exit the vehicle and the premises after being issued such warning gave rise to probable cause for an arrest.  The use of OC spray to force the Defendant out of the car rather than the police breaking into the car is simply not unreasonable.

15

By Yost's police report, twenty minutes had elapsed between Yost checking out on the call and the Defendant's arrest. While this is not an insignificant period of time in the context of a <u>Terry</u> investigative stop, some portion of this time is attributable to the Defendant and the information he provided the police.  In <u>Sharpe</u>, the court rejected that "a 20-minute stop was unreasonable when the police [had] acted diligently and a suspect's actions [contributed] to the added delay about which he complains."  <u>Id.</u> at 688.

I therefore conclude that the firearms and ammunition seized from the vehicle and Defendant's post-arrest statement were the product of a lawful detention and should not be suppressed.


V.

For the foregoing reasons, I recommend that the court deny Defendant's **Motion to Suppress** (Doc. 23).

Respectfully submitted this
5th day of May 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

16

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations

contained in this report within ten days from the date of its service may constitute a waiver of

the issues raised herein and shall bar an aggrieved party from attacking the factual findings on

appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); M.D. Fla. R.

6.02.


Copies furnished to:
The Honorable Elizabeth A. Kovachevich, U.S. District Judge
Assistant United States Attorney Patricia Kerwin
Assistant Federal Public Defender Mary Mills

17